OPINION
DIETZEN, Justice.
In this case, we revisit'the applicability of equitable subrogation to parties in a landlord-tenant relationship. Respondent Melrose Gates, LLC (Landlord) leased an apartment to appellants Chor Moua and Maisse Xiong (Tenants). The apartment building in which Tenants lived was damaged by a fire. Landlord’s insurer paid for the repairs to the building, and then the insurer brought a subrogation action in the name of Landlord ágainst Tenants to recover the money the insurer paid to repair the building. * The district- court relied on'our decision in RAM Mutual Insurance Co. v. Rohde, 820 N.W.2d 1 (Minn. 2012), to grant summary judgment to Tenants, concluding that Landlord may not maintain a subrogation action in these circumstances. The court' of appeals reversed and remanded, reasoning that the lease agreement clearly reflected the parties’ expectation that Tenants would be liable. For the reasons set forth below, we conclude that the Landlord can proceed on a subrogation claim against Tenants for damage they caused to their own apartment, but not for damage to other property belonging to Landlord. We therefore affirm the decision of the court of appeals in part, reverse in part, and remand for further proceedings consistent - with this opinion.
I.
Landlord owns a residential rental- property in Brooklyn Center consisting of approximately 36 units. Landlord -leased apartment 311 to Tenants for an initial rental period running from November 1, 2008 to April 30, 2009; Thereafter the lease agreement was extended" under its original terms on a rhonth-to-m'onth basis.
Under the written lease, Tenants were required to pay rent of $800 per month, and to provide.a security deposit of $759. The lease included blank lines that the parties filled in for the street address of the premises and the apartment number. The lease covered a variety of topics, in- *817 eluding liability for damage to the leased property.
On June 2, 2012, Tenants’ apartment and a neighboring apartment were damaged by a fire. For purposes of this 'appeal, the parties agree that the fire was caused by Tenants’ negligence. Landlord had an insurance policy for the entire complex with coverage of approximately $19 million. Landlord’s insurer, State Farm Fire and Casualty Company, paid approximately $470,000 for repairs to the building.
Tenants had a renter’s insurance policy with American Family Insurance with limits of approximately $20,000 in personal property coverage and $300,000 in personal liability coverage. In November 2013, State Farm brought this subrogation action against Tenants to recover the money it had paid to repair the damage caused by the fire. • ■
The parties filed cross-motions for summary judgment. The district court granted Tenants’ motion and dismissed the sub-rogation action with prejudice. Applying the factors we articulated in RAM Mutual Insurance Co. v. Rohde, 820 N.W.2d 1, 14-16 (Minn.2012), the court determined that the parties did not reasonably expect that Tenants would be liable for these losses.
Landlord appealed,[1]-and the court of appeals- reversed and remanded. Melrose Gates, LLC v. Moua, No. A14-1131, 2015 WL 1608845, -at *4 (Minn.App. Apr. 13, 2015). Like the district court, the court of appeals applied our decision in RAM to determine whether a subrogation action was available. 2015 WL 1608845,-..at *3-4. Unlike the district court, the .court, of appeals determined that the parties reasonably would have expected that Tenants would be .liable in a subrogation action for the damage they caused. Id. at *4. Applying a de novo standard of review, the court of appeals concluded that the lease “unambiguously provides” - that Tenants would reimburse Landlord for any damage caused by their negligence, that no other provision of the lease calls that unambiguous provision into question, and that the parties’ intentions were therefore discernible from the language of the lease itself. Id.
IL
Tenants argue that the court of appeals misappliéd our decision in RAM Mutual Insurance Co. v. Rohde, 820 N.W.2d 1 (Minn.2012), to the facts of this case. As a threshold matter, the • parties dispute whether our standard of review of the district court’s decision is de novo or for an abuse of discretion. The parties also dispute whether the insurer may maintain a subrogation action against the negligent tenants in this case. Because the law with respect to subrogation and the standard of review are intertwined, we will first discuss the relevant subrogation law before addressing the standard of review.
A.
Subrogation is the substitution of one party for another whose debt the party pays, which entitles the paying .party to step into the shoes, or be substituted to all the rights, priorities,, remedies, liens, and securities , of, the other party. RAM, 820 N.W.2d at 5 (citing 16 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 222:5 (3d ed.1995)); see also Black’s Law Dictionary 1654-55 (10th ed.2014).
*818 Generally, there are two types of subrogation: equitable and conventional. Medica, Inc. v. Atl. Mut. Ins. Co., 566 N.W.2d 74, 77 (Minn.1997). Equitable subrogation has its origins in common law, and its purpose is to place the responsibility for the payment of the debt upon the one who in equity ought to pay it. Id. (citing Westendorf ex rel. Westendorf v. Stasson, 330 N.W.2d 699, 703 (Minn.1983)). Conventional subrogation is contractual and springs from the agreement between the insured and the insurer. Id. Under conventional subrogation, the parties may grant greater subrogation rights under the contract than would be recognized in equity. Id. (citing 16 George J. Couch, Couch on Insurance 2d § 61:3 (rev. ed.1983)). But even under conventional subrogation, the terms of subrogation are governed by equitable principles unless the contract clearly and explicitly provides to the contrary. Id. (citing Westendorf, .330 N.W.2d at 703).
Subrogation in the context of insurance is “the substitution of an insurer (subrogee) to the rights of the insured (subrogor).” RAM, 820 N.W.2d at 5 (quoting Medica, Inc., 566 N.W.2d at 76). Put differently, when an insurer has paid a loss, “the insurer is subrogated in a corresponding amount to the insured’s right of action against any third party whose wrongful conduct caused the doss.” Id. at 5-6. In'this case, State Farm paid Landlord’s costs to repair the apartment building and therefore seeks compensation in that amount under Landlord’s right of action against Tenants.
To determine whether an insurer may maintain a subrogation action against the insured’s negligent tenant, this court has adopted a case-by-case approach. Id. at 11-12. In doing so, we rejected the approach taken by the.court of appeals .in United Fire & Casualty Co. v. Bruggeman, 505 N.W.2d 87, 88-90 (Minn.App.1993), rev. denied (Minn. Oct. 19, 1993), which had adopted a rule that “barr[ed] insurers from pursuing subrogation claims against negligent tenants in the absence of an express agreement to the contrary.” RAM, 820 N.W.2d at 11. Instead, we l-easoned that a subrogation action is grounded in the contractual relationship between the landlord and the tenant, as well as the contractual relationship between the insurer and the insured, and therefore a rule that is defined .by the respective contracts is superior to one that makes legal assumptions that do not comport with the reasonable expectations of the parties to the contract. Id. at 12. Moreover, the case-by-case approach best effectuates the intentions of the parties while taking into account equitable considerations. Id. at 12-13. Finally, the case-by-case approach “is more consistent with Minnesota’s public policy of holding tort-feasors accountable for their actions,” Id. at 13. ....
In RAM we also provided several principles to guide a district court’s determination of which party bears financial responsibility for a particular loss. We stated that the analysis “begins with the written documents executed by the parties.” Id. at 14. The lease agreement is a contract,which the court should interpret to determine whether it addresses the allocation of liability for a particular loss. See id. The lease itself may “indicat[e] which party agreed to bear the risk of loss for a particular type of damage.” Id. at 15. For example, if the landlord were obligated to procure insurance governing a particular type of loss, such an obligation would be evidence that the insurer would not be able to maintain a subrogation action against the tenant. Id. But if the tenant were obligated to procure insurance covering a particular type of loss, that would be *819 evidence that the tenant would be liable for that particular loss. Id. '
Significantly, we observed that “[o]ften a court will be able to determine the expectations of the parties from the language of the lease itself.” Id. But we also noted that the court may consider “other admissible evidence shedding light on the expectations of the parties,” such as the types and amounts of insurance actually purchased by the parties. Id. (quoting Rausch v. Allstate Ins. Co., 388 Md. 690, 882 A.2d 801, 814 (2005)). Finally, we stated that the court may consider principles of equity and good conscience, such as whether the lease is a contract of adhesion, whether the lease provisions allocating responsibility are unfair and in violation of public policy, and whether “the leased premises are part of a- large multi-unit structure,” Id. at 16.
B.
With these principles in mind we return to the question of the applicable standard of review. The case comes to us on review of the district court’s grant of summary judgment. When we review a grant of summary judgment, we must cOn-sid.er whether there are any genuine issues of material fact-and whether the district court erred in its application of the law. Leamington Co. v. Nonprofits’ Ins. Ass’n, 615 N.W.2d 349, 353 (Minn.2000). In a typical case, when the material facts are not in dispute, an appellate court will review the district court’s grant of summary judgment de’ novo. See Medica, Inc., 566 N.W.2d at 76. The court of appeals applied that standard below, and Landlord argues that we should do so as well.
Tenants, however, argue that the de novo standard of review is inappropriate in this case because the district court weighed equitable factors. As we have recognized, “[t]he doctrine of subrogation is of purely equitable origin and nature.” N. Trust Co. v. Consol. Elevator Co., 142 Minn. 132, 138, 171 N.W. 265, 268 (1919). Ordinarily, this 'court “reviewts] a district court’s decision to award equitable relief ... for abuse of discretion.” Dakota Cty, HRA v. Blackwell, 602 N.W.2d 243, 244 (Minn.1999).
Generally, litigants have- no right to a jury trial on the merits of equitable claims, and traditionally the judge serves as the trier of fact for such claims. United Prairie Bank-Mountain Hake v. Haugen Nutrition & Equip., LLC, 813 N.W.2d 49, 54 (Minn.2012) (stating that the right to a jury trial extends only to actions at law, not actions in equity); Raymond Farmers Elevator Co. v. Am. Sur. Co. of N.Y., 207 Minn. 117, 119, 290 N.W. 231; 233 (1940) (holding that there was no error when the court discharged the jury and' determined equitable claims). We give deference to a district court’s equitable determinations because the court acts like a fact-finder, weighing all relevant factors and considering the unique facts of each case. See Krmpotich v. City of Duluth, 483 N.W.2d 55, 57 (Minn.1992) (applying an abuse of discretion standard to a claim under the Environmental Rights Act “where the trial court weighted] the equities in a balancing test ‘analogous to the one traditionally employed by. courts of equity’ ” (quoting Minn. Pub. Interest Research Grp. v. White Bear Rod & Gun Club, 257 N.W.2d 762, 782 (Minn.1977))). In such circumstances, our deference is supported in large part by a conclusion that the district court is in' the best position to analyze the facts and balance, the relevant factors.
Our recent decisions have taken differing, approaches to. resolving the conflict between the de novo standard of review applicable to á district court’s decision granting or denying summary judgment *820 when the facts are not in dispute, on the one hand, and the abuse of discretion standard applicable to a district court’s decision whether to grant equitable relief, on the other.[2] In Medica, Inc.,, we addressed the question whether a health maintenance organization has subrogation rights against an insurer that issued a general liability policy. 566 N.W.2d at 77-78. The district court had granted sunuáary judgment to the general liability insurer, holding that the HMO had no such subrogation rights on either a contractual or an equitable theoryt Id. at 76. We stated that “[bjecause the parties do not dispute the relevant facts, a de- novo standard of review is applied to determine whether the district court erred in its application of the law.” Id. Although we recognized that “even when the right to subrogation is contractual, the terms of the subrogation will be governed by equitable principles,” id. at 77, we did not consider whether the equitable nature of subrogation would affect the standard of review.
. In Citizens State Bank v. Raven Trading Partners, Inc., 786 N.W.2d 274 (Minn. 2010), we considered the .application of principles of equitable subrogation in the mortgage-payment context. There, a borrower applied the proceeds of a loan to the balance, due on prior mortgages on real property. Id. at 276. The district court granted summary judgment to the lender, holding that the lender was equitably sub-rogated to the priority positions of the two prior mortgagees. Id. at 276-77. We “note[d] that the question of the proper standard of review for a district court’s decision on a motion for summary, judgment regarding the applicability of equitable subrogation is not clearly settled in Minnesota,” and specifically that “[n]one of our previous cases analyzing the applicability of equitable subrogation involving *821 the priority of mortgages discussed the applicable standard of review when there are cross-motions for summary judgment.” Id. at 277 n. 2. We applied an abuse of discretion standard to review the district court’s decision, id. at 277, but stated that “we need not decide the proper standard of review because we would reach the same result” under either[1] an abuse of discretion standard or “under our normal review on appeal from summary judgment,” id. at 278 n. 2. [1]
In’ SCI Minnesota Funeral Services, Inc. v. Washburn-McReavy Funeral Corp., 795 N.W.2d 855 (Minn.2011), we considered whether the parties to a stock sale transaction were entitled to reformation or rescission of the transaction based on mutual mistake. The district court granted summary judgment to the defendants, holding that the evidence did not satisfy the elements required for reformation and that there was no mutual mistake. Id. at 859. We analyzed “the proper standard of review that applies to the review of a grant of summary judgment involving claims for equitable relief’ and concluded that a de novo standard applied. Id. at 860. We acknowledged that' “[a] deferential standard of review might be[1]’applicable where, after balancing the equities, the district court determines not to award equitable relief,” id., but where “the district court ruled as .a - matter' of law that, the requirements for rescission and reformation were not met” and the court also “ruled based on Undisputed facts .... in response to the parties’ cross-motions for summary judgment,” the de novo standard of review “does not change simply because the claims, at issue are for equitable relief,” id. at 861. .
•In RAM, we addressed substantially the same issue that wé address here: whether an insurer was entitled to be subrogated to the insured landlord’s claims against a tenant. 820 N.W.2d at 4. As discussed above, the district court rejected the subrogation claim as a matter of law, ruling, .that an insurer could never be subrogated to a landlord’s claims, against a tenant under the court of appeals’ decision in Bruggeman, 505 N.W.2d 87, See 820. N.W.2d at 4, We stated:
While subrogation . is an equitable remedy, a standard of review more deferential than de novo, which may be applicable on appeal. from summary judgment “where, after balancing .the equities, the district court determines not to award equitable relief,” is not applicable here where the- district court determined as a matter of law that RAM could not maintain a.subrogation .action,
820 N.W.2d at 6 n. 3 (quoting SCI, 795 N.W.2d at 860-61).[3]
Applying the principles from these precedents, we conclude that the posture of'this case most closely resembles that presented in our decisions in SCI and RAM.. As in SCI, the district court in this case made its decision .based on the parties’¡cross-motions for summary judgment, a posture in which the parties implicitly, if not actually, agree that there is no dispute as to the material facts.. See SCI, 795 N.W.2d at 861. Indeed, in this case the relevant facts are undisputed by . the par *822 ties. Also in SCI, as here, “the district court ruled as a matter of law the requirements for” an equitable remedy “were not met.” Id.; see also RAM, 820 N.W.2d at 6 n. 3 (stating that an abuse of discretion standard “is not applicable here where the district court determined as a matter of law that RAM could not maintain a subro-gation action”).
A close examination of the district court’s opinion reveals'that its treatment of equitable principles does not justify a deferential standard of review. Initially, we note that although the district court stated that it was “balancing] ‘the principles of equity and good conscience,’” in fact the court considered only one such principle, namely “whether the leased area is part of a multi-unit complex.” There is no indication in the district court’s order or the accompanying memorandum that the court considered counterbalancing factors and weighed them to reach a resolution of the particular issue before it. Nor, for that matter, did the district court base its decision on specific facts relevant to the parties to this case. Instead, it simply took our general reasoning in RAM about the nature of multi-unit structures and applied it, as a matter of law, to Landlord and Tenants in this case.
We conclude' that the district court’s treatment of equitable principles in this case demonstrates that it'neither weighed the equities, nor made its decision based on factual findings that it was uniquely well-suited to make. Instead, the court decided the parties’ cross-motions for summary judgment on the basis that “as a matter of law the requirements for [subro-gation] were not met.” SCI, 795 N.W.2d at 861. Under such circumstances, where the lease is clear, the facts are undisputed, and the district court grants judgment as a matter of law, de novo review of the district court’s' conclusions is appropriate. Id.
C.
We turn now to the merits of the district court’s decision. Here our task is to determine the expectations of the parties to the contract as to which party bears responsibility for the loss. RAM, 820 N.W.2d at 14. Under RAM, we first interpret the language of the lease. Id. The provisions of a leáse are interpreted in the context of the entire agreement. Id. (citing Hydra-Mac, Inc. v. Onan Corp., 450 N.W.2d 913, 916 (Minn.1990)). When the language of a lease is unambiguous, we give the words their plain and ordinary meaning. Id. at 14-15 (citing Metro. Airports Comm’n v. Noble, 763 N.W.2d 639, 645 (Minn.2009)). But if the language of a lease is ambiguous, it should be construed against the drafter. Id. at 15 (citing Hilligoss v. Cargill, Inc., 649 N.W.2d 142, 148 (Minn.2002)).
The portion of the lease that discusses liability of the Tenants is contained in section F, which is entitled “LIABILITY OF RESIDENT AND MANAGEMENT.”[4] Paragraph. 27 of section F provides as follows:
•'27. RESIDENT SHALL REIMBURSE MANAGEMENT FOR: 1) Any ' loss, property damage, or cost of repair or service (including plumbing problems) caused by negligence or improper use by RESIDENT, his/her agents, family or guests; 2) any loss or damage caused by doors' or windows being left open; 3) all costs MANAGEMENT has because of abandonment of the Apartment or other *823 violations of the Lease'by RESIDENT, such as costs for advertising the Apartment; 4) all court costs and attorney’s fees MANAGEMENT has in--any suit for eviction, unpaid rent, or any other debt or charge.
The district court concluded that paragraph 27 did not specifically “allocate the risk of loss such as' that caused by fire” and therefore did “not show that the parties intended or reasonably expected that [Tenants] would be liable for these losses.” The court of appeals interpreted the language of the lease broadly, concluding that Tenants agreed to reimburse Landlord for any- damage caused by their negligence. Melrose Gates, 2015 WL 1608845, at *4.
The district court’s interpretation ignores the plain language of the lease. Paragraph 27 plainly states that Tenants shall reimburse Landlord for “[a]ny loss, property damage, or cost of repair or service (including plumbing problems) caused by negligence or improper use by [Tenant], his/her agents, family or guests” (emphasis added). The scope of paragraph 27 is very broad and encompasses “any loss.” The word “any” in this context fe Without limitation and unambiguously refers to all losses including-loss by-fire. See The American Heritage- Dictionary 81 (5th ed.2011) (defining “any” in relevant part as “[o]ne, some, every, or all without speeifi-cation”). It- clearly demonstrates that the parties • anticipated that Tenants would bear responsibility for damages from a fire loss caused by their negligence.
. But our interpretation of paragraph 27 does not end our inquiry. Landlord argues that Tenants’ liability under paragraph 27 extends to the entire building. To address this argument, we return to the language of the lease. Based upon our review of the entire lease agreement, we cannot conclude that paragraph 27 unambiguously applies to .damage caused by Tenants outside of the leased premises. Instead,,we interpret paragraph 27 to apply only to damage caused by Tenants .to the “Apartment” as that term is defined in the lease, namely as apartment 311 itself, exclusive of any other apartments or common areas.
Initially, we note that the vast majority of the parties’ obligations are connected to the Apartment rather than to the apartment building in general. For example, paragraph 5 governs who may live in the Apartment.[5] Tenants’ promises in paragraph- 7 are mostly related to the use of the Apartment, but that paragraph also contains promises regarding • locations “near” the Apartment as well as “common areas” and the “area surrounding the building."[6]
*824 The parties’ promises regarding damage are even more tightly bound up with the Apartment. To be sure, in paragraph 10 Landlord promises to. keep common areas, as well as the Apartment, in appropriate condition.[7] But paragraph 11 contains no promises on behalf of Tenants that extend outsidé the Apartment; 'they promise only to keep the Apartment in good, clean condition and not to alter it, -and that when they leave “the Apartment will be left in good condition, except for ordinary wear and tear.”[8] Similarly, paragraph 12 allows Landlord to keep “all- or part of the security deposit ..: 'for damage to the Apartment beyond ordinary wear and tear”; it says nothing explicitly authorizing Landlord to use the security' deposit for damage caused by Tenants to other units or common areas.
When viewed in this light, the reference in paragraph 27 to- “[a]ny loss, property damage, or cost of repair.or service (including plumbing problems) caused by negligence or improper use by” Tenants or their agents, family, or guests, is best understood as- referring to loss,- property damage, or cost of repair or service with respect to the.Apartment. -The term “improper use” references Tenants’ earlier promises in paragraph 7 to use the Apartment, rather than other units, appropriately; and the terms “loss, property damage, or cost of repair or service” most naturally reference Tenants’ promises in paragraph 11 not to “damage the Apartment”-;- not to “paint or wallpaper the.-Apartment, or make any structural.change in the Apartment”; to “keep the Apartment clean, and •in compliance with- all health and safety codes”; and to leave “the Apartment ... in good condition.”
This interpretation is consistent with paragraph 12,; which authorizes Landlord to use Tenants’ security deposit “for damage to the Apartment beyond ordinary wear and tear”: if Tenants had agreed to accept liability under the lease for damage they negligently caused to Landlord’s property other than the Apartment, the lease might be expected to explicitly permit the security deposit to be used to cover such damage. Furthermore, this interpretation of Tenants’ liability under paragraph 27 gains support from our observation in RAM that “in the absence of , a Very clear contractual obligation to the contrary, the tenant likely is not thinking beyond the leased premises.’ ” 820 N.W.2d at 16 (quoting Rausch, 882 A.2d at 816). At the very least, the lease is ambiguous as to whether paragraph 27 is applicable to *825 damage caused by Tenants to property other than the Apartment. And construing the ambiguity against. Landlord,[9] we conclude .that paragraph 27, is limited to loss and damage to the Apartment.
No other provision of the lease draws this interpretation into question. For example, paragraph 25 absolves Landlord of liability for damage done to Tenants, their guests, or their property “that was not caused by” Landlord, and recommends that Tenants “obtain Renter’s insurance to protect against injuries or property damage.”[10] The court of appeals interpreted these provisions as “reflect[ing] an intention that each party be responsible for damage caused by their actions.” Melrose Gates, 2015 WL 1608845, at *4. We do not completely agree. To be sure, the statement that Landlord is not responsible for damages it did not cause does support that interpretation, if only slightly. But the recommendation that Tenants obtain renter’s insurance “to protect against injuries or property damage,” in a paragraph dealing with damage to Tenants, their guests, and their property, cannot be understood as a recommendation 'for Tenants to obtain insurance to cover damage to Landlord’s property. In short, paragraph 25 neither strongly supports nor undermines any particular interpretation. Thus, the parties’ lease, when taken as a whole, supports the conclusion that the parties reasonably expected that Tenants would be responsible for damage caused by them to the leased premises — that is, to, the Apartment — but not for damage they, negligently cause to other property of Landlord.
The remaining factors identified in RAM also support our conclusion. See 820 N.W.2d at 15-16. One such factor is “the types of insurance purchased by each party as evidence of each party’s expectations with respect to its responsibility for particular losses.” Id. at 15. Landlord took out an insurance policy on the entire apartment complex with coverage of approximately $19 million, whereas Tenants’ renters’ insurance policy was limited to $300,000 in personal liability coverage. The district court concluded that this discrepancy indicated that the parties could not have expected Tenants to be liable for claims to Landlord or its insurer, a conclusion that the court of appeals rejected based on its view that Tenants “require far less coverage.” Melrose Gates, 2015 WL 1608845, at *4. But Tenants require less coverage only if their liability is limited to damage they cause to their own apartment. If Tenants are instead liable on literally any subrogation claim, as they would be under the court of appeals’ holding, then they might face liability for the entire complex far in excess of their coverage. And equitable considerations, including the fact that Tenants’ apartment was part of a large multi-unit structure, add further, support to our conclusion.[11]
*826 Finally, Tenants allege that because Bruggeman had not yet been overruled at the time they entered into their lease (and was therefore the governing law in Minnesota), the parties could not reasonably have expected that Tenants would be liable for subrogation claims at all. We disagree/ Although Bruggeman was the governing law at the time, we doubt that the parties could have formed firm expectations about subrogation without definitive authority from this court. Further, in RAM we set forth the relevant factors for the court to consider in determining the intent of the parties. We did not mention this factor, and that omission could not have been accidental, because this factor would have been significant in that -case. See RAM, 820 N.W.2d at IS (stating that the district court erroneously relied on Bruggeman, which was good law at the time). Tenants’ contention is therefore inconsistent with our opinion in RAM.
III. ■
We hold that- when a district court grants summary judgment dismissing an equitable claim on the ground that, as a matter of law, the requirements for equitable relief were not met, and the record shows that the facts were undisputed and the district court did not weigh equitable factors, an appellate court reviews the district court’s decision de novo. Accordingly, we affirm the court of' appeals ■ with respect to the standard of review.
We further hold that under the factors set forth in RAM Mutual Insurance Co. v. Rohde, 820 N.W.2d 1, 14-16 (Minn.2012), the lease clearly provided that Tenants are liable for negligence that results in damage to the leased premises, and there is no other language in the lease that changes the expectation of Tenants’ liability. It is reasonable and fair that Tenants , should be liable for negligence they cause to the/ leased premises. The other factors identified in RAM do not change our conclusion. Because we conclude that the parties would reasonably have expected that Tenants would bé liable” for damage they caused to their own apartment, but not to other property belonging to Landlord, we affirm the decision of the court of appeals in part, réverse in part, and remand to the district court for further proceedings consistent with this opinion,. .
Affirmed in part, reversed in part, and remanded. ■
Concurring in part and dissenting in part, LILLEHAUG, J„ GILDEA, C.J., ANDERSON, J.

. In fact, State Farm appealed, asserting Landlord’s rights against Tenants. For simplicity, throughout the remainder of this opinion we will refer to the acts and arguments pf State Farm, asserting Landlord’s claims against Tenants in this litigation, simply as the actó and arguments of Landlord.

. The dissent cites to numerous cases in which this court, the court óf appeals, and the federal courts have referenced the discretionary nature, of equitable determinations. But with only two exceptions, those cases did not involve the situation presented in this case, in which the district court determined cross-motions for summary judgment, based on undisputed facts, when equitable relief was sought. See Christopher Phelps & Assocs., LLC v. Galloway, 492 F.3d 532, 546 (4th Cir. 2007) (holding that the decisión whether to 'grant an injunction, following a jury trial, was within the discretion of the trial court); Kansas City S. Transport Co. v. Teamsters Local Union 41, 126 F.3d 1059, 1063 (8th Cir.1997) (reviewing grant of preliminary injunction for abuse of discretion); Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth., 100 F.3d 1287, 1292. (7th Cir. 1996) (reviewing the denial of a preliminary injunction for an abuse of discretion); City of North Oaks v. Sarpal, 797 N.W.2d 18, 24 (Minn.2011) (holding "that a district court’s conclusion on equitable estoppel after a bench trial'is reviewed for abuse of discretion.”); Dakota Cty. HRA v. Blackwell, 602 N.W,2d 243, 244 (Minn.1999) (applying an abuse of discretion standard to a grant of specific performance following a court trial); Krmpotich, 483 N.W.2d at 57 (reviewing a trial court’s weighing of equitable factors following a bench trial for abuse of discretion); Flynn v. Sawyer, 272 N.W.2d 904, 91-0 (Minn.1978) (applying an abuse of discretion standard of review to a trial. court’s- decision, following trial, to grant specific performance of a contract); AMF Pinspotters, Inc. v. Harkins Bowling, Inc., 260 Minn. 499, 504, 110 N.W.2d 348, 351 (1961) (reviewing the grant of a temporary injunction under an abuse of discretion standard).
Moreover,- in the exceptional cases, in which the courts have faced a posture similar to this case, they have applied de novo review, See Minn. Laborers Health & Welfare Fund v. Granite Re, Inc., 844 N.W.2d 509, 513 (Minn.2014) (applying de novo review when the district court made a decision on summary judgment on "a purely legal question” bearing on whether equitable relief was available); Brown v. Lee, 859 N.W.2d 836, 839 (Minn.App.2015), rev. denied (Minn. May 19, 2015) (declining to apply a" "more deferential standard of review” when a district court "without balancing the equities ... concluded” that a party was not entitled to equitable relief “as a matter of law”).

. In Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 826 (Minn.2012), we reviewed the district court's dismissal on summary judgment of plaintiffs’ employee wage claims, including an equitable claim for unjust enrichment. We reviewed the dismissal of plaintiffs’ contractual and statutory claims under our typical summary judgment standard. Id. at 831-32. In reviewing the dismissal of the unjust enrichment claim, we cited our decisions in SCI and Citizens State Bank before concluding that because “the claim fails under either a de novo or the more deferential abuse of discretion standard, we decline to .resolve the .standard of review question in this case.” 820 N.W.2d at 838.

. Although we refer to respondent as "Landlord” and appellants as "Tenants," the lease the parties signed used the terms “Management” and "Resident,” respectively. The difference in nomenclature does not affect our ■ reasoning.

. 5. OCCUPANCY AÑD USE: Only the persons listed above as RESIDENTS may live in the Apartment. Persons not listed as RESIDENTS may live in the Apartment only with the prior written consent of MANAGEMENT. RESIDENTS may use the Apartment and utilities for normal residential purposes only.

. 7. RESIDENT PROMISES: ... 2) to use the Apartment only.as a private residence, and not to engage in any activity or allow any condition that is illegal or dangerous or which would cause a cancellation, restriction . or increase in premium in MANAGEMENT’S insurance; 3) not to use or store on or near the Apartment any flammable, toxic, hazardous, or explosive substance; 4) not to interfere in the management and operation of the Apartment building; ... 6) that the Apartment, common areas, or area surrounding the building will not be used by the RESIDENT, any member of the RESIDENT'S household, any guest of, the RESIDENT, or by anyone acting under his/her control to manufacture, ■ sell, give away, barter, deliver, exchange, distribute, possess or use any illegal drugs; or to engage in prostitution or any prostitution related activity; or to unlawfully use or possess any firearm; or to allow any stolen property on the premises.

. 10, MANAGEMENT PROMISES: 1) That the Apartment and all common areas are fit for use as residential premises; 2) to keep the Apartment in reasonable repair and make necessary repairs within a" reasonable time after written notice by RESIDENT except when damage is caused by the intentional or negligent conduct of the RESIDENT or his/ her guests; 3) to maintain the Apartment in compliance with applicable health and safety codes ■ except when a violation of the health and safety codes has been caused by the intentional or negligent conduct of.the RESIDENT or his/her guests; 4) to keep the common areas clean and in good condition,

. 11,'RESIDENT PROMISES: 1) Not to damage or misuse the Apartment or waste the utilities provided by MANAGEMENT, or allow hisAter guests to do so; 2) not to paint or wallpaper the Apartment, or make any structural changes in the Apartment without the prior written consent of MANAGEMENT; 3) . to keep the Apartment clean, and in compliance with all health and safety .codes; 4) to give written notice to MANAGEMENT of any necessary repairs to be made; 5) to notify MANAGEMENT immediately of any conditions in the Apartment- that arfe dangerous to human health or safety, or which may damage the Apartment or waste utilities provided by MANAGEMENT; 6) that when RESIDENT moves out,' the Apartment will be left in good condition, except for’ ordinary wear and tear.....

. Although the form lease in ’this case was prepared by the Minnesota Multi Housing Association, we nevertheless conclude that it is appropriate to construe the form lease, prepared for use by landlords and presented by Landlord to Tenants in this case, against Landlord as if it were the drafter. Cf. DeJong v. Sioux Center, Iowa, 168 F.3d 1115, 1121 (8th Cir.1999) (construing, ambiguities in form lease against party that presented lease).

. 25. DAMAGE' OR INJURY TO RESIDENT OR HIS/HER PROPERTY: MANAGEMENT is not responsible for any damage or injury that is done to RESIDENT or-his/her property, guests or their property that was not caused by MANAGEMENT. MANAGEMENT recommend that RESIDENT obtain Renter’s insurance to protect against injuries or property damage.

. The other equitable consideration we mentioned in RAM was "whether the lease is a contract of adhfesiofi.” 820 N.W.2d at 16. Tenants do not argue that their lease was a v contract of adhesion.

. Tenants purchased a renters insurance policy providing $300,000 in personal-liability coverage. The personal-liability coverage included compensatory damages for bodily injury to a person injured on or off the premises. The policy also provided $20,200 in personal-property coverage.